**FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **In Re: Rare Breed Triggers Patent Litigation** | **4:26-md-03176-ALM**<br>**MDL 3176** |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>80MILLS LLC, d/b/a TACTICAL TITAN SUPPLY, and PEARSON GARDNER,<br><br>Defendants. | Civil Action No. 4:26-cv-00380-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>CHRISTOPHER COPE,<br><br>Defendant. | Civil Action No. 2:26-cv-00033-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>DNT LLC, d/b/a DEEZ NUTZ TACTICAL, and ZACH MORROW,<br><br>Defendants. | Civil Action No. 4:26-cv-00377-ALM |

| | |
|---|---|
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., | Civil Action No. 4:26-cv-00369-ALM |
| Plaintiffs, | |
| v. | |
| HANES TACTICAL, LLC, and DAMION TERRELL BENNETT, | |
| Defendants. | |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., | Civil Action No. 4:26-cv-00379-ALM |
| Plaintiffs, | |
| v. | |
| HARRISON GUNWORKS LLC, and TYLER HARRISON, | |
| Defendants. | |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., | Civil Action No. 2:26-cv-00030-ALM |
| Plaintiffs, | |
| v. | |
| MARS TRIGGER, LLC, and PETER BRENNEN, | |
| Defendants. | |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., | Civil Action No. 2:26-cv-00056-ALM |
| Plaintiffs, | |
| v. | |
| MISTER GUNS, LLC, THOMAS CARTER II, | |

2

| | |
|---|---|
| and BRANDI CARTER<br><br>   Defendants. | |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>   Plaintiffs,<br><br>v.<br><br>STEVEN THANH NGUYEN, d/b/a POLYMER PEW,<br><br>   Defendant. | Civil Action No. 4:26-cv-00425-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>   Plaintiffs,<br><br>v.<br><br>OPTICS PLANET, INC., d/b/a ECENTRIA,<br><br>   Defendant. | Civil Action No. 4:26-cv-00521-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br><br>   Plaintiffs,<br><br>v.<br><br>PISTOLCAP LIMITED COMPANY, d/b/a FRISCO GUNS, and MORDEKHAI HARROCH,<br><br>   Defendants. | Civil Action No. 2:26-cv-00053-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC., | Civil Action No. 2:26-cv-00055-ALM |

3

Plaintiffs,

v.

PROSOURCE FIREARMS, LLC,

    Defendant.

---

ABC IP, LLC, and RARE BREED TRIGGERS, INC.,

    Plaintiffs,

v.

SUPERIOR FIREARMS OF TEXAS, LLC,

    Defendant.

Civil Action No. 2:26-cv-00058-ALM

---

ABC IP, LLC, and RARE BREED TRIGGERS, INC.,

    Plaintiffs,

v.

Z3 PRODUCTIONS, LLC, d/b/a Z3PRO,

    Defendant.

Civil Action No. 4:26-cv-00367-ALM

---

**DECLARATION OF LAWRENCE DEMONICO IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

4

I, Lawrence DeMonico, declare as follows:

## I.       BACKGROUND AND PERSONAL KNOWLEDGE

1.       My name is Lawrence DeMonico. I am President of Rare Breed Triggers, Inc. ("Rare Breed"), and I have held this position since the company started in 2020. I am the sole officer and principal decision-maker for Rare Breed. In this role, I am directly involved in Rare Breed's product strategy, pricing decisions, manufacturing costs, and interactions with customers and potential dealers.

2.       Before joining Rare Breed, I spent approximately twenty years in the special-operations community, including service with SEAL Team Six, and later worked as a private military contractor. I entered the firearms industry in 2016, when I started my first firearms brand.

3.       I make this declaration based on my personal, first-hand knowledge and on information I receive in the ordinary course of my work.

## II.       THE PLAINTIFFS: RARE BREED TRIGGERS AND ABC IP

4.       Rare Breed Triggers, Inc. is a Texas corporation with its principal place of business in Wichita Falls, Texas. Rare Breed designs, manufactures, and sells what it has coined "forced reset" trigger ("FRT®") products.

5.       ABC IP, LLC ("ABC") is a Delaware limited liability company. ABC owns the patents asserted in these cases: U.S. Patent Nos. 12,038,247 (the "'247 Patent"); 12,031,784 (the "'784 Patent"); 12,529,538 (the "'538 Patent"); 12,578,159 (the "'159 Patent"); and 12,636,403 (the "'403 Patent") (collectively, the "Asserted Patents"). ABC exclusively licensed those patents to Rare Breed. Attached as Exhibits A, B, C, and D are true and correct copies of (i) the Exclusive Patent License Agreement dated October 20, 2022, between ABC and Rare Breed, (ii) the Addendum to that Agreement dated May 19, 2025, (iii) the Second Addendum to that Agreement

1

dated January 20, 2026, and (iv) the Third Addendum to that Agreement dated April 11, 2026. I am familiar with these agreements in my capacity as President of Rare Breed.

6.      Rare Breed currently has a 12-person team. That team includes engineering, finance, customer service, in-house counsel, web development, and other personnel supporting the business. The company operates out of Wichita Falls, Texas.

## III.    DEVELOPMENT OF FRT® TECHNOLOGY

7.      In 2020, Rare Breed brought the FRT-15® to market. It was the first commercially available "forced reset" trigger of its kind.

8.      Before bringing the FRT-15® to market, Rare Breed conducted extensive due diligence to ensure the product was lawful, obtaining two expert opinions confirming that the FRT-15® was a legal semi-automatic trigger—not a machine gun. After launch, we obtained two additional expert opinions reaching the same conclusion. All four experts were former Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") special agents. One was the former chief of the ATF's Technology Branch, the division that determines what constitutes a machine gun. Another had taught the machine-gun classification curriculum at the ATF academy. A third had written the textbooks used at the academy for that purpose. The fourth was a practicing attorney who provided a formal legal opinion letter. All four concluded that the FRT-15® was a lawful semi-automatic trigger.

9.      The development process that led to the FRT-15® did not happen overnight. The underlying concept and early prototype work took place over an extended period. By the time Rare Breed acquired the rights and moved toward commercialization, there was proof of concept, but the product was not ready for commercial sale. Rare Breed then spent approximately eight months working with a machine shop through repeated testing, redesign, and refinement to turn that

concept into a marketable trigger. During that same period, Rare Breed also invested substantial time and resources in planning how to bring the product to market lawfully and responsibly.

10.    Rare Breed brought the FRT-15® to market at the end of 2020.

## IV.    THE DOJ DISPUTE, INJUNCTION, AND SETTLEMENT

11.    Approximately nine months after Rare Breed brought the FRT-15® to market, the ATF sent Rare Breed a cease-and-desist letter asserting that the FRT-15® was a machine gun. Rare Breed disagreed and filed a declaratory judgment action in the Middle District of Florida seeking a ruling that the FRT-15® was a lawful semi-automatic trigger.

12.    Rather than litigate whether the FRT-15® constituted a machine gun, the U.S. Department of Justice ("DOJ") brought a civil action in the Eastern District of New York, alleging mail fraud and wire fraud. The DOJ obtained an *ex parte* temporary restraining order that was converted into a preliminary injunction, effectively shutting down Rare Breed's operations. The DOJ never brought criminal charges.

13.    The injunction did not just prevent Rare Breed from manufacturing and selling its products. Both Rare Breed and the DOJ understood that any attempt by Rare Breed to enforce its patent rights would be treated as a violation of the injunction. I was unwilling to risk being held in contempt of court, and so Rare Breed did not enforce any of its patents during this period—even after the '247 and '784 Patents issued in July 2024 while the injunction was still in force.

14.    In parallel with the New York action, Rare Breed teamed with the National Association for Gun Rights to bring a declaratory judgment action in the Northern District of Texas. Judge Reed O'Connor ruled that Rare Breed's products were not machine guns and were lawful semi-automatic triggers. The DOJ appealed to the Fifth Circuit, but before a decision issued, the parties reached a settlement in mid-May 2025.

15.     Under the settlement, the DOJ dismissed the case in the Eastern District of New York, withdrew its Fifth Circuit appeal, and acknowledged that Rare Breed's products could be lawfully sold subject to certain conditions: that Rare Breed will not manufacture "forced reset" triggers for handguns, that Rare Breed will enforce its patents against devices it has a good-faith belief infringe its patent portfolio, and that Rare Breed will promote the safe and responsible use of its products. The patent-enforcement obligation runs for the life of U.S. Patent No. 10,514,223 (the "'223 Patent"). Attached as Exhibit E is a true and correct copy of the Settlement Agreement dated May 9, 2025, between the U.S. Department of Justice, Rare Breed, and myself (among other claimants).

16.     The litigation with the DOJ lasted approximately four years, during which Rare Breed spent millions of dollars in legal fees. By the time the settlement was reached, Rare Breed's financial resources were severely depleted. Before we could begin enforcing our patents, we first needed to rebuild our financial position and retain attorneys capable of handling the complexity of our patent portfolio and the high volume of infringers.

17.     Once Rare Breed had retained counsel and was in a position to act, we moved quickly. To date, Rare Breed has filed more than 45 patent infringement actions—all since the May 2025 settlement.

## V.     CURRENT PRODUCT LINE AND PIPELINE

18.     Between launching the FRT-15® and settling with the DOJ in May 2025, Rare Breed heavily invested in research and development. It expanded its engineering and design team, continued to patent new technology, and developed "forced reset" trigger models for a range of firearm platforms. As a result of that work, Rare Breed now offers seven commercially available "forced reset" trigger models and has many more in various stages of development.

4

19. For AR-15-style rifles, Rare Breed currently sells three FRT® products: (1) the FRT-15L3®, available in curved and flat configurations at a retail price of $450; (2) the FRT-MR3™, designed for HK's piston-driven AR-platform rifles and available in curved and flat configurations at $525; and (3) the FRT-15C3™, a two-stage, three-position FRT® for the AR-15, at a retail price of $450. The FRT-15C3™ incorporates technology covered by the '247, '159, and '403 Patents. Attached as Exhibits F through H are true and correct copies of FRT® product listings for the AR-15 found at rarebreedtriggers.com.

20. Separate from its AR-15 product line, Rare Breed offers two FRT® models designed for an entirely different firearm platform—the HK MP5/SP5. These are sold under the FRT-RD3™ brand: the FRT-RD3™ (SEF) at $615 and the FRT-RD3™ (AMBI) at $620. Attached as Exhibits K and L are true and correct copies of product listings for the HK MP5/SP5 found at rarebreedtriggers.com.

21. All seven FRT® models operate in three modes: safe, traditional semi-automatic, and "forced reset."

22. Rare Breed has additional products in development that will incorporate technology covered by the '784 Patent. These products are intended for different rifle platforms, including larger-caliber platforms such as .308-based systems. The '784 Patent's locking mechanism is not limited to the AR-15 platform and can be applied to other embodiments with adjustments to geometry.

23. Rare Breed has multiple additional new trigger designs in development. Even during the period when Rare Breed was enjoined by the federal government, we continued to design, develop, and patent new "forced reset" technology because we were confident we would

5

ultimately prevail. ██████████████████████████████

████████████

24.     All of Rare Breed's revenue comes from its FRT® products and related FRT® parts. Rare Breed does not sell any other firearms, firearm components, or accessories.

## VI.    THE ASSERTED PATENTS AND PATENT PORTFOLIO

25.     ABC currently holds 15 issued U.S. patents in the reset trigger space. Other patent applications remain pending. To my knowledge, ABC is the only entity in the country with any issued patents covering "forced reset" trigger technology.

26.     ABC owns U.S. Patent No. 12,038,247, which issued on July 16, 2024, and was assigned to ABC by Brian A. Blakley on May 28, 2023. The '247 Patent covers a trigger mechanism with a three-position selector providing three modes of operation: safe, standard semi-automatic with a disconnector, and "forced reset." The FRT-15C3™ operates differently from the FRT-15L3®: instead of using the hammer's rearward motion to reset the trigger, it uses a cam to reset and lock the trigger until the bolt carrier returns to the safe to fire position. That different operating system also produces a different feel for the shooter. The FRT-15L3® is a single-stage trigger in both semi-automatic and "forced reset" mode, whereas the FRT-15C3™ is a two-stage trigger in semi-automatic mode and a single-stage trigger in "forced reset" mode.

27.     ABC owns U.S. Patent No. 12,578,159, which issued on March 17, 2026, and was assigned to ABC by Brian A. Blakley on May 28, 2023. The '159 Patent covers a trigger mechanism with a three-position safety selector—with safe, semi-automatic, and "forced reset" positions—in which a cam and safety selector determine whether manual pressure must be released before the trigger can be pulled.

28.     ABC owns U.S. Patent No. 12,529,538, which issued on January 20, 2026, and was assigned to ABC by Cameron Smith on October 30, 2025. The '538 Patent covers a three-position cam selector and applies specifically to the Super Safety product.

29.     ABC owns U.S. Patent No. 12,031,784, which issued on July 9, 2024, and was assigned to ABC by me on November 4, 2022. I am the named inventor. The '784 Patent covers a locking mechanism for a "forced reset" trigger. The '784 Patent is not limited to the AR-15 platform and can be applied to other embodiments, including .308/AR-10 systems.

30.     ABC owns U.S. Patent No. 12,636,403, which issued on May 26, 2026, and was assigned to ABC by Mladen Thomas Strbac on October 21, 2022. The '403 Patent covers a trigger device in which the firearm's cycling action causes the hammer to contact the trigger, mechanically resetting both the hammer and trigger after each shot. The device can be operated in either of two modes: a standard semi-automatic mode (using a conventional disconnector) or a "forced reset" semi-automatic mode.

31.     ABC has exclusively licensed all five Asserted Patents to Rare Breed. Exs. A–D. ███████████████████████████████████████████ ███████████████████████ ████████████████████████████████████ .

## VII.   NOTICE TO DEFENDANTS AND CONTINUED INFRINGEMENT

32.     As part of my responsibilities at Rare Breed, I monitor the reset trigger market on a daily basis. Through that monitoring, I am aware of each of the Defendants in this consolidated proceeding and the Accused Products (as defined in the Plaintiffs' Consolidated Motion for Preliminary Injunction) that each one offers or sells—the Atrius Selector, the Super Safety, the ARC-Fire, and related kits and components.

33.     Once Rare Breed had retained counsel and was in a position to enforce its patents, we moved as quickly as we could. The scale of the infringement we had identified meant that we

had to prioritize. I directed counsel to focus first on the Defendants whose products and sales volume posed the most immediate competitive threat to Rare Breed and on those whose products were derived from the publicly released Hoffman Tactical design files. Those include each of the actions now consolidated in this MDL.

34.     The Defendants in this MDL received notice of Rare Breed's patent rights through three mechanisms. First, a subset of Defendants received pre-suit notice of the relevant Asserted Patents and the specific Accused Products at issue, and Rare Breed demanded that they cease all infringing sales. Attached as Exhibits M–R are true and correct copies of the cease-and-desist letters sent by Rare Breed's counsel, at my direction, to 80Mills, LLC; DNT LLC; Hanes Tactical, LLC and Damion Bennett; Harrison Gunworks LLC and Tyler Harrison; Steven Nguyen; and Z3 Productions, LLC. Each letter identifies the Asserted Patent(s) at issue, identifies the specific Accused Products at issue, and demands that the recipient cease all infringing sales. I have reviewed Exhibits M–R, and they fairly and accurately reflect the cease-and-desist letters as sent. Similarly, Peter Brennen—the owner of MaRs Trigger, LLC—and I participated in a conference call around March 2025, in which I explained that sales of the Super Safety constituted infringement of the '247 and '784 Patents.

35.     Second, all the Defendants received notice through service of the operative complaint in their respective member cases.

36.     Third, every Defendant had additional, public notice as of February 11, 2026, when the Eastern District of Tennessee preliminarily enjoined Defendants Timothy Hoffman and Hoffman Tactical, LLC from selling the Super Safety, after finding it likely to infringe two of the Asserted Patents in *ABC IP, LLC et al. v. Hoffman et al.*, No. 1:25-cv-00389-CLC-CHS (E.D. Tenn.).

8

37.    Based on my daily monitoring of the reset trigger market, each Defendant in this MDL continued selling the Accused Products after receiving notice through one or more of these mechanisms.

38.    AS Designs' response to Rare Breed's cease-and-desist correspondence illustrates the pattern of Defendants' responses to notice. In August 2025, I directed Rare Breed's counsel to send a cease-and-desist letter to Defendant Matthew Karlovic of AS Designs. The cease-and-desist letter identified the '247 Patent, notified Karlovic that the Super Safety, ARC-Fire, AR MP5-K Lower, and related components infringe that patent, and demanded that AS Designs immediately cease all sales and provide detailed information regarding units sold, revenue, and its supply chain. The letter set a compliance deadline of August 22, 2025, and warned that continued infringement could result in treble damages and attorneys' fees. Attached as Exhibit S is a true and correct copy of that cease-and-desist letter dated August 9, 2025, sent by Rare Breed's counsel to Defendant Matthew Karlovic at my direction.

39.    Around that same period, I also encountered AS Designs and its principals in person at a trade show in Tennessee. At that show, AS Designs displayed a booth with signage presenting itself as an innovator in the "forced reset" space, and I personally observed AS Designs marketing certain Accused Products there.

40.    During that trade-show encounter, I spoke with Defendant Calvin Olson. He and the others at the booth knew who Rare Breed was. I handed Olson the cease-and-desist letter and made clear that AS Designs was on notice of Rare Breed's patent rights. During that conversation, Olson asserted that AS Designs' products did not infringe. Based on my familiarity with Rare Breed's products and patents, I disagreed.

41.     AS Designs never provided a substantive response that resolved Rare Breed's infringement concerns. Instead, AS Designs has continued to sell the Super Safety, ARC-Fire, and related products through its website and other marketing channels.

42.     Rather than respond to the cease-and-desist letter through normal channels, AS Designs publicized the encounter on its Instagram account (@asdesignsfrts) the same day. The post included a photograph of me and other Rare Breed representatives at the AS Designs booth, with the caption: "The one and only Rare Breed stopped by the booth at GOALS to give us a 'gift' nice meeting you guys! See you soon. #rarebreed #asdesigns #goals #ARCFire." The "gift" referenced in the post was the cease-and-desist letter I had just handed to Mr. Olson. Attached as Exhibit T is a true and correct copy of the post and associated public comments, captured from https://www.instagram.com/p/DNJtM8yu4of/. The post was publicly accessible at the time of capture and, on information and belief, remains publicly accessible. Some additional comments were flagged by Instagram's content moderation and may not be visible to all users; I include them only to the extent they were captured from the public-facing page. I have reviewed Exhibit T and it fairly and accurately reflects the Instagram post and the associated public comments as they appeared at the time of capture.

43.     The post drew hundreds of public comments, the overwhelming majority hostile to Rare Breed. Commenters publicly called for boycotts of Rare Breed's products, including: "Boycott Rare Breed"; "I will never buy another one of their products, and I'm ashamed to say i have. I actively recommend anything else when they're mentioned"; and "I used to respect RareBreed and have one of their AR triggers. They just lost me with this." Others reframed Rare Breed's enforcement of its patent rights as a betrayal of the firearms community, with one commenter writing that Rare Breed was "do[ing] the government's dirty work of restricting FRTs

10

in exchange for immunity" and were "the prison snitches of our community." Account (@floridagunlawyerspl) publicly encouraged AS Designs to "sue them first for declaratory relief. Crowd fund your legal bills. Put them out of business. LFG!!!!" Another commenter asked whether Rare Breed could be "ban[ned] . . . from GOA [a firearms conference] indefinitely" because of the cease-and-desist.

44.    Rare Breed's own social media posts have drawn a steady stream of public hostility from consumers who fault Rare Breed for enforcing its patents—including former customers who say they will not buy from Rare Breed again. Attached as Exhibit U is a true and correct compilation of screenshots of five Rare Breed Firearms Facebook posts and their corresponding user comments, captured between April 20, 2026, and May 26, 2026. Each post is identified within Exhibit U by its publication date, its source URL, and the date and time of capture, as reflected in the screenshot metadata. The five posts comprise:

a)    The April 17, 2026 post ("Ain't she pretty?"), captured April 20, 2026, captured from: https://www.facebook.com/rarebreedfirearms/posts/pfbid0L1TxFiwTSw34aQz9JrE2f LcfP5NHm9hVzn9SXCuvgertJLJfd1gV684pKWSVjqfdl (Ex. U at 2–18);

b)    The April 21, 2026 post ("Go ahead and jump!"), captured April 23, 2026, from: https://www.facebook.com/rarebreedfirearms/posts/pfbid0PFkBx4fKK7Jur2ny8MQ GgM4Z9vkVE6zGvKvqsvdRJMBxuDsF1UuKWRn3gKKMWVB7l (Ex. U at 19–22);

c)    The May 16, 2026 post ("I see it, I like it, I want it."), captured May 26, 2026, from: https://www.facebook.com/rarebreedfirearms/posts/pfbid024C7tgUBvNbKmkb9mN TMN9nuHgLxXDHFVcdw5udsbNgyapHo8UCKFdzNNWgevn9vRl (Ex. U at 22–31);

11

d) The May 19, 2026 post ("FRT-RD3 (SEF) available right meow!"), captured May 26, 2026, from:

https://www.facebook.com/rarebreedfirearms/posts/pfbid0jMUPA1hssgezPcXf8c3S WTAHpYt9JQPHubeXti4989DKVEYH5CBambUgeM8YN9o6l (Ex. U at 32–37); and

e) The May 20, 2026 post ("FRT-RD3 (AMBI) are available right meow!"), captured May 26, 2026, from:

https://www.facebook.com/rarebreedfirearms/posts/pfbid0mv7D9qu9PN38XyJVaSuj 8aSh1W4LTBSso8sDFLQsaYf9rGYBVwhJGT23t1EF7FRql (Ex. U at 38–47).

I have reviewed Exhibit U, and it fairly and accurately reflects each Facebook post and its associated comments as they appeared at the time of capture.

45.    Exhibit U includes numerous comments by Facebook users disparaging Rare Breed for enforcing its patents and stating that they will not purchase from Rare Breed as a result:

- "Why yall sue my boy tho[?]" *Id.* at 15.

- "So that lawsuit against Hoffman Tactical huh?"; "NEver a penny to Rare Breed." (receiving five "likes" from other Facebook users). *Id.* at 30.

- "You will never get a dime from me because you're suing Hoffman Tactical." *Id.* at 31.

- "[Y]ou guys are absolute BITCHES for trying to sue Hoffman tactical for making the super safety . . . ." *Id*. at 37.

- "I will never buy from a rare breed because I think they're scumbags[.]" *Id*. at 43.

- "[Y]ou clearly dont know anything about rare breed. [T]hey are the worst thing to happen to the 2a community. They are just ATF lackies." *Id*. at 45.

- "Don't support this shit company"; "Will never buy anything from lowlife corporate scum suing Hoffman tactical. I hope you all go bankrupt."; "Anyone supporting this company is either knowingly or unknowingly eroding the 2nd Amendment. Look up their lawsuit against Hoffman Tactical. This company needs to go bankrupt and never come back."; "I was a supporter until their deal with the ATF. Now I'm a big fan of Hoffman for making their design publicly available, rare breed will never be able to stop alternatives thanks to them." *Id*. at 46.

- "[W]orst company to be in the 2a community."; "Wish they were available from a respectable company that doesn't sue every single other one from selling, pure scumbag move." *Id*. at 47.

46.    In my experience in this industry, the kind of public opposition reflected in these posts—calls for boycotts, encouragement of countersuits, and demands that Rare Breed be excluded from industry events—damages Rare Breed's standing with customers, dealers, and trade organizations in ways that money cannot undo.

47.    This is consistent with my broader observation that the proliferation of infringing products, and the public narrative being built around them, is causing irreversible harm to Rare Breed's standing in the market.

## VIII.   DEFENDANTS' ACTIVITIES

48.    80Mills LLC ("80Mills"), doing business as Tactical Titan Supply, has sold infringing products through its Facebook page and private Facebook groups. 80Mills continues to sell infringing products after being given notice of the Asserted Patents.

49.    Kristopher Cope ("Cope") is an individual who resides in Las Vegas, Nevada.

13

50.    Cope sells at least two types of Super Safety "kits": (1) a kit including a cam and cam lever, and (2) a kit including a cam, cam lever, trigger, hammer, and associated springs. Cope sells Super Safety devices while attending and participating in gun shows. Cope continues to sell infringing products after being given notice of the Asserted Patents.

51.    DNT LLC sells infringing products through its Facebook page and private Facebook groups.

52.    Damion Terrell Bennett owns and operates Hanes Tactical LLC ("Hanes"). Hanes manufactures and sells Super Safety products and related components. Hanes continues to sell infringing products after being given notice of the Asserted Patents.

53.    Steven Thanh Nguyen ("Nguyen") does business as Polymer Pew from his residence in Rosenberg, Texas. Nguyen maintains a private mailbox for Polymer Pew in Rosenberg, Texas.

54.    ProSource Firearms, LLC ("ProSource") sells infringing Atrius Selector products and Super Safety products. ProSource sells infringing products through its physical storefronts.

55.    Superior Firearms of Texas, LLC ("Superior") sells infringing Atrius Selector products. Superior sells products through its physical storefront.

56.    Z3 Productions, LLC ("Z3") sells products through private Facebook groups.

## IX.    HARM TO RARE BREED'S BUSINESS

57.    Based on my experience running this company for six years and monitoring this market daily, I describe below the harm that Defendants' continued sales of the Accused Products have caused, and continue to cause, to Rare Breed's business.

58.    By the time Rare Breed settled with the DOJ in May 2025, we had identified approximately seventy companies selling infringing reset trigger products. The majority of those infringers were selling products derived from design files that Defendant Hoffman Tactical had

released publicly for free download. Since the settlement, the number of infringers has continued to grow; based on my monitoring, new ones appear on a near-daily or weekly basis.

59.    Rare Breed pays ABC a ▮▮▮▮▮▮▮▮ on every trigger sold. After accounting for manufacturing costs and that royalty, the per-unit economics are as follows:

| Model | Retail Price | Manufacturing Cost | ABC's Royalty | Rare Breed's Profit | Combined Lost Profit |
|---|---|---|---|---|---|
| FRT-15L3® | $450 | ▮[1] | ▮ | ▮ | ▮ |
| FRT-15C3™ | $450 | ▮ | ▮ | ▮ | ▮ |
| FRT-MR3™ | $525 | ▮ | ▮ | ▮ | ▮ |
| FRT-RD3™ (SEF) | $615 | ▮ | ▮ | ▮ | ▮ |
| FRT-RD3™ (AMBI) | $620 | ▮ | ▮ | ▮ | ▮ |

60.    Rare Breed has historically positioned its products as premium, high-quality products and, consistent with that positioning, has maintained a no-discount policy and has not run sales. That policy was part of both Rare Breed's business practice and its brand identity.

61.    Rare Breed originally launched the FRT-15L3® in May 2025 at a retail price of $499. In approximately August 2025, I made the decision to reduce the retail price to $450. That pricing change followed feedback and observations that customers were directly comparing Rare Breed's products to significantly cheaper competing reset trigger products, including the Atrius Selector, the Super Safety, and the ARC-Fire sold by the Defendants in this MDL. Based on my monitoring of public listings and customer feedback, Defendants sell their AR-platform Accused Products in a range of approximately $80 to $270, depending on the product, the seller, and the

---

[1] On cross-examination during the preliminary injunction hearing in *ABC IP, LLC et al. v. Hoffman et al.*, No. 1:25-CV-389 (E.D. Tenn. Jan. 28, 2026), and again during the temporary restraining order/preliminary injunction hearing in *ABC IP, LLC v. Peak Tactical, LLC*, No. 26-CV-018-KHR (D. Wyo. Feb. 4, 2026), I testified that the manufacturing cost of the FRT-15L3® and MR3™ was approximately ▮. I was testifying from memory; I have since confirmed that the actual manufacturing cost of the 15L3® is ▮ and ▮ for the MR3™.

configuration in which it is offered. A Defendant-by-Defendant compilation of the Accused Products each Defendant sells, along with the price at which each Accused Product is offered, is included in the Defendant Product & Pricing Chart at Appendix A to Plaintiffs' Consolidated Motion for Preliminary Injunction.

62. The price floor for infringing products extends well below AS Designs' prices. Based on my monitoring of the market, infringing Super Safety products made from 3D-printed materials have sold for as little as $10, and products imported from overseas have sold for as little as $20. If manufacturers adopt metal injection molding—a process that allows mass production of thousands of units per week—the per-unit production cost could drop to approximately $5.

63. The pricing pressure is visible publicly. Attached as Exhibit V is a true and correct screenshot of a YouTube video titled "3 Position Super Safeties have entered the Market | AS Designs ARC," posted by the Desk Pop channel and available at https://www.youtube.com/watch?v=-bGHV2UAwDg. At the time the screenshot was taken, the video showed approximately 169,000 views. In the video description, the creator states that AS Designs had released its "Arc-fire" trigger system "for half the price of Rare Breed's FRTL3," apparently referring to Rare Breed's FRT-15L3®. I have reviewed Exhibit V, and it fairly and accurately reflects the YouTube video page as it appeared at the time of capture. I regularly monitor public marketing and commentary in the reset trigger market, and this screenshot reflects the price-based competition Rare Breed now faces publicly. It shows that AS Designs' product is being promoted to consumers specifically by comparing it to Rare Breed's product as a lower-priced alternative. In my experience, this kind of public price comparison puts direct pressure on Rare Breed's pricing, undermines Rare Breed's premium brand positioning, and contributes to the erosion of customer demand for Rare Breed's products.

16

64.    The pricing pressure is not isolated to AS Designs' ARC-Fire. Consumers responding to Rare Breed's own marketing posts on Facebook routinely cite the Accused Products' lower prices as a reason not to buy from Rare Breed. *See* Ex. U. The same is true of Rare Breed's marketing posts on Instagram. Attached as Exhibit X is a true and correct screen capture of Rare Breed's May 21, 2026, Instagram post and corresponding comments. The post's URL and date/time of capture are reflected in the screen capture metadata within Exhibit X. I have reviewed Exhibit X, and it fairly and accurately reflects the Instagram post and comments as they appeared at the time of capture. The following are examples of customer comments regarding Rare Breed's product pricing—including price comparisons with Accused Products—from these posts:

a) "Not $600 pretty though. Especially when you can take a FRS for $250 and a slip trip for $60 bucks and does the same thing for $300 less." Ex. U at 13 (Ruger Winchell, commenting on Rare Breed's April 17, 2026 FRT-RD3™ post).

b) "[S]uper safety is way cheaper." *Id.* at 15 (Logan Wise, same post).

c) "Only if they were not $450." *Id.* at 20 (Stacy Poteet, commenting on Rare Breed's April 21, 2026 product post).

d) "Have y'all seen the prices?" *Id.* at 29 (Richard Nasoulinh, commenting on Rare Breed's May 16, 2026 FRT-RD3™ post).

e) "Super safety is 100$ . . . ." Ex. X at 1 (dusty_lee_upchurch, commenting on Rare Breed's May 21, 2026 Instagram post).

f) "I got 5 super safetys for the price of one of these . . . ." Ex. X at 1 (countrystyle2000, same post).

g) "[W]here can I get this SS you speak of for my sp5? . . . [C]heck out deeznutz tactical!" Ex. X at 2-3 (fowlerhayes7 and dusty_lee_upchurch, same post).

17

65.     Based on my regular monitoring of public marketing and commentary in the reset trigger market, public price-based comparisons of this kind appear across multiple channels and product families, and put direct pressure on Rare Breed's pricing in a market where customers actively comparison-shop before purchasing.

66.     The harm to Rare Breed's reputation and innovator status is also visible publicly. Attached as Exhibit W is a true and correct screenshot of comments posted on a public Rare Breed Firearms social-media post regarding the FRT-15C3™. The comments were publicly accessible on Facebook at the time the screenshot was captured. They have since been removed in the course of Rare Breed's content moderation of its own page but were publicly visible to Rare Breed's followers and the broader public during the relevant time period. I have reviewed Exhibit W and it fairly and accurately reflects the comments as they appeared at the time of capture. I regularly monitor public reactions to Rare Breed's products, and this screenshot reflects the kind of reputational harm Rare Breed is now facing in the market. In the screenshot, a commenter publicly asks whether the FRT-15C3™ is "based on the super safety" and suggests that Rare Breed merely adapted that competing product's cam concept.

67.     That premise is exactly backward. The mechanical "forced reset" mechanism embodied in the FRT-15C3™ originated with inventor Brian Blakley. On April 25, 2003, Blakley filed the patent application that issued as U.S. Patent No. 7,398,723 (the "'723 Patent"), titled "Trigger Forward Displacement System and Method." The '723 Patent disclosed the foundational cam-reset mechanism: a cam rotated by the rearward travel of the bolt that mechanically moves the trigger forward into the ready-to-fire position. Blakley assigned the '723 Patent to ABC, and ABC owns it today.

18

68.     Rare Breed brought the first commercially available "forced reset" trigger to market and has invested substantial time and resources in developing and patenting its technology. As infringing products like the Super Safety become more widespread, they create public confusion about who actually invented this technology and undermine Rare Breed's reputation as the original innovator in the reset-trigger space.

69.     In my experience, the reset-trigger market is a small, niche segment of the firearms accessories market in which customers actively comparison-shop before purchasing. Prices are publicly listed on manufacturer websites and online retailers, and customers routinely discuss and compare products in Facebook groups, firearm forums like AR15.com, YouTube review channels, and social media. For example, on a single Rare Breed Firearms Facebook post promoting the FRT-RD3™ (AMBI), consumers openly compared the product's $600 price point to alternative configurations costing approximately $300 total, Ex. U at 13, identified and recommended specific competing products by name, *id.* at 2–3, 12, 15, and compared the product's performance and features against competing manufacturers' offerings, *id.* at 2, 9.

70.     Consumer price sensitivity matters because Rare Breed's pricing flexibility is constrained on the cost side. Across Rare Breed's product line, per-unit manufacturing costs vary by model, but every unit sold also carries a ▮▮▮▮▮▮▮ obligation to ABC. Those combined costs leave limited room for further price reductions; cutting prices further would reduce per-unit margins below a level that can sustain the business.

71.     To date, Rare Breed has sold its products primarily through direct retail sales rather than through distributors or dealers. Previously, Rare Breed could not even fill its retail orders and therefore had no need for a dealer program. Rare Breed was still building and scaling its manufacturing capabilities, which takes time. ▮▮▮▮▮▮▮▮▮▮▮▮

19

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

72.     Rare Breed also requires prospective dealers to agree not to sell products that Rare Breed has identified as infringing. ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ As a result, Rare Breed not only lost a prospective dealer relationship and the future revenue it would have generated but now finds itself in the untenable position of having to consider legal action against one of its best customers. And this scenario is likely to repeat itself as more retailers stock infringing products alongside Rare Breed's own.

73.     Reset triggers are durable products designed to last as long as the rifle in which they are installed. A firearm owner typically needs only one reset trigger per rifle, and once installed, there is no reason to replace it.

74.     But many reset trigger customers own multiple rifles and are potential repeat purchasers. Rare Breed has more than ████ customers who have purchased more than one reset trigger. In my experience, once a customer commits to a competing product on one platform, we lose the opportunity to build a relationship with a customer who might otherwise have purchased multiple reset triggers across multiple firearms over time.

20

75.     Based on my experience monitoring this niche market, Rare Breed effectively held the entire commercially available "forced reset" trigger market when it first launched its products because there were no comparable competing reset trigger products then being sold. Today, in my good-faith estimate, Rare Breed holds ▮▮▮▮▮▮▮▮ of the reset trigger market. That estimate is based on my day-to-day monitoring of competing products online and at gun shows, and on the visible spread of competing products like the Super Safety, ARC-Fire, and other copycat reset trigger products.

76.     Based on my experience running Rare Breed and monitoring this market, the combination of lost sales, price erosion, and market saturation is creating significant uncertainty about how much of the market will remain available for Rare Breed's existing products, including the newly launched FRT-15C3™.

77.     This market pressure has already forced Rare Breed to make business decisions it would not otherwise have made. As I described, Rare Breed reduced the price of the FRT-15L3® from \$499 to \$450 in response to the influx of competing reset trigger products. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In the ordinary course, Rare Breed would have continued selling directly to consumers at its established pricing for longer. Instead, competing infringing products forced Rare Breed to change course.

78.     In my judgment, the harm extends beyond the revenue Rare Breed has already lost. Rare Breed's patents should give it time—time to build expertise, customer relationships, and a technological lead in this market. The DOJ settlement in May 2025 opened that window for the first time, but only after nearly four years during which Rare Breed was prevented from enforcing

21

its patents and spent millions of dollars in litigation. Based on what I observe in the market, Defendants' continued sale of the Accused Products has taken that lead time away.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___May 28, 2026___, in ___Austin, TX___.

_____
Lawrence DeMonico

22